1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

JANET SIHLER, individually and on
behalf of all others similarly situated;
CHARLENE BAVENCOFF, individually
and on behalf of all others similarly
situated,

Petitioners,

v.

MICROSOFT CORPORATION,

Respondent.

CASE NO. 2:24-mc-00062-TL

ORDER ON MOTION FOR
RECONSIDERATION

12
13
14
15
16
17
18
19

This matter is before the Court on Respondent Microsoft Corporation's Motion for

20 Reconsideration (Dkt. No. 9) of the Court's prior Order on Petitioners' Motion to Compel (Dkt.

21 No. 8). Having reviewed Petitioners' response (Dkt. No. 12) and the relevant record, the Court

22 DENIES the motion.

23
24

## I.     BACKGROUND

The general background for this matter is recounted in the Court's prior Order. *See* Dkt. No. 8 at 2–3. Relevant to the instant motion, Petitioners attached to their subpoena a declaration by David Flynn, which was obtained in related federal litigation in which they are plaintiffs.[1] *See* Dkt. No. 1-2 at 11–12. In the declaration, Flynn identifies his Skype screen name ("xcellent.choice") and explains that he made screenshots and exports of various Skype and Telegram chats, which he provided to Petitioners. *Id.* at 11. He concludes:

> I understand Plaintiffs' counsel may seek to subpoena additional Skype chats in additional litigation in which Plaintiffs or Plaintiffs' counsel is engaged. I hereby consent to any third party, including Microsoft, producing to Plaintiffs or Plaintiffs' counsel any Skype chats in their possession, custody or control that include me or my Skype ID if such Skype chats or conversations include any of the following individuals or Skype IDs:
>
> - Nicholas Carroll
> - Skype screen name: n.carroll_6
> - Johnny DeLuca
> - Anthony Pugliese
> - Skype screen name: apugliese_12
> - Brandon Figueroa
> - Skype screen name: brandontfigueroa
> - Aurora Marshall
> - Skype screen name: a.marshall_24
> - Benjamin Scrancher (aka Ben Scrancher)
> - Skype screen name: b.scrancher
> - Meghan O'Donnell
> - Skype screen name: m.odonnell_19
> - Skype screen name: m.jacula
> - Melissa Flipski
> - Skype screen name: melflipski
> - Gary Cardone
> - Monica Eaton (aka Monica Cardone)
>
> This consent to production applies without regard to whether I have been removed from the chat or conversation or have cleared

---

[1] *See Sihler et al. v. The Fulfillment Lab, Inc., et al.*, No. C20-1528 (S.D. Cal.).

the chat or conversation history or otherwise no longer have access
to the chats or conversations in question.

I hereby declare the above statements are true and correct under
the penalty of perjury under Federal law.

*Id.* at 11–12. The declaration is electronically signed and dated April 30, 2024. *Id.* at 12.

Respondent objected to the subpoena and represented that it would not produce responsive documents, leading to Petitioners' Motion to Compel. Dkt. No. 1 at 2. In their reply brief, Petitioners noted that Flynn completed and resubmitted Respondent's standard consent verification form to provide full consent. *See* Dkt. No. 6 at 30–31 (blank standard form); Dkt. No. 7-8 at 2–3 (Flynn's unaltered form). In granting Petitioners' motion, the Court observed, "As it appears that Petitioners successfully persuaded Flynn to sign Respondent's form without alterations, there is no live issue with respect to ECPA [the Electronic Communications Privacy Act]." Dkt. No. 8 at 5. The Court thus did not address whether Flynn's declaration was sufficient to establish consent under ECPA. *Id.* at 5 n.2.

Respondent now states that, unbeknownst to the Court, "the second consent form from Mr. Flynn failed [Respondent's] verification process." Dkt. No. 9 at 2. "If a purported accountholder fails [Respondent's] verification process, [Respondent] does not view the unverified consent as sufficient under the ECPA to disclose the content of communications." *Id.* at 3. Respondent states that its Law Enforcement National Security division determined that "the information provided in the verification form was incomplete or did not match the registration data in the account." *Id.* On November 21, 2024—after the close of briefing on Petitioners' motion but prior to the Court's Order—Respondent's counsel emailed Petitioners' counsel informing them of this issue. *See* Dkt. No. 10 at 4 (email). Counsel stated that "for security reasons" Respondent could not "point to which data point doesn't match." *Id.* Respondent states that Petitioners never responded to this email. Dkt. No. 9 at 3.

1    Respondent moves for reconsideration of the Court's prior Order. *See* Dkt. No. 9.

2    Petitioners oppose. *See* Dkt. No. 12.

3                    **II.    LEGAL STANDARD**

4    "Motions for reconsideration are disfavored." LCR 7(h)(1). Such motions must be denied

5    absent a showing of "manifest error in the prior ruling or . . . new facts or legal authority which

6    could not have been brought to [the Court's] attention earlier with reasonable diligence." *Id.*

7    Motions for reconsideration should be granted only in "highly unusual circumstances." *Marlyn*

8    *Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (quoting

9    *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)); *see also Inventist, Inc. v.*

10   *Ninebot Inc.*, 664 F. Supp. 3d 1211, 1215 (W.D. Wash. 2023) (noting reconsideration is an

11   "extraordinary remedy," and the moving party bears a "heavy burden"). "A motion for

12   reconsideration 'may not be used to raise arguments or present evidence for the first time when

13   they could reasonably have been raised earlier in the litigation.'" *Marlyn Nutraceuticals*, 750

14   F.3d at 880 (quoting *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)).

15   "Whether or not to grant reconsideration is committed to the sound discretion of the court."

16   *Navajo Nation v. Confederated Tribes & Bands of the Yakima Indian Nation*, 331 F.3d 1041,

17   1046 (9th Cir. 2003).

18                    **III.    DISCUSSION**

19   Respondent argues that the fact that "Mr. Flynn did not provide sufficient information to

20   confirm his ownership of the account and valid consent" means that there is still a live issue with

21   respect to ECPA. Dkt. No. 9 at 4. Respondent seeks denial of the prior Motion to Compel or a

22   stay of its obligation to comply with the Order pending verification of consent. *Id.* at 5. As to

23   consent, Respondent argues that Flynn "should resubmit a fully compliant consent form" or,

24   "[i]n the alternative, . . . submit evidence sufficient for the Court to conclude that Mr. Flynn

1   owns the account at issue and has consented" to disclosure of his communications. *Id.* at 4. In

2   response, Petitioners argue that the motion fails because Respondent could have attempted to

3   verify Flynn's consent in October 2024 and thus raised the issue in its prior briefing, but did not.

4   *See* Dkt. No. 12 at 3–4. Petitioners also argue that the motion fails because ECPA does not

5   require consent to be verified on Respondent's preferred form. *See id.* at 4–5.

6       As an initial matter, the Court finds that Respondent failed to raise this issue in a timely

7   manner. Petitioners rightly emphasize that Flynn's first verification form was provided to

8   Respondent on October 11, 2024, two weeks before Respondent's response to Petitioners'

9   motion was due, yet Respondent did not verify the information in a timely manner. Dkt. No. 12

10  at 4. Instead, Respondent flagged just one problem with the form (*i.e.*, Flynn's alteration of the

11  form to limit consent) without reviewing the form to see if there were any other problems (*e.g.*,

12  form answers that did not match Respondent's information). Then, upon receiving Flynn's

13  second form on October 24, 2024, Respondent was somehow unable to verify the contents of the

14  form (which essentially contains just five pieces of information) until around November 21,

15  2024, when its counsel notified Petitioners of Flynn's failed process. Dkt. No. 10 at 4. This

16  course of behavior suggests that Respondent was not diligent in processing Flynn's verification

17  form and notifying Petitioners of any issues, thus resulting in the Court's Order based on

18  outdated information and the instant motion. On this ground alone, the motion could be denied as

19  based on "evidence . . . that could reasonably have been raised earlier in the litigation." *Marlyn*

20  *Nutraceuticals*, 571 F.3d at 880. Still, the Court will also address the ECPA issue.

21      "Title II of ECPA, termed the Stored Communications Act [("SCA")], covers access to

22  electronic information stored in third party computers." *In re Zynga Privacy Litig.*, 750 F.3d

23  1098, 1104 (9th Cir. 2014) (citing 18 U.S.C. §§ 2701–12). ECPA generally prohibits a service

24  provider from disclosing the contents of an account holder's communications. 18 U.S.C.

§§ 2702(a)(1)–(2). However, the service provider may disclose the communications if one of several exceptions applies. 18 U.S.C. § 2702(b)(1)–(9). Relevant here, one such exception is that a provider may disclose the communications "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service." 18 U.S.C. § 2702(b)(3).

The Parties dispute what is required to show "lawful consent" under ECPA. The statute is silent as to what that phrase means. *See* 18 U.S.C. § 2711 (definitions). And to the best of the Court's knowledge, caselaw provides little guidance.[2] In the absence of a clear rule or even a guiding standard, service providers like Respondents are left to make their best guess as to what constitutes "lawful consent" such that they can lawfully comply with ECPA.

The Court does not purport to create a rule or standard here. But wherever the floor may ultimately be set for proving lawful consent under ECPA, the Court finds that a sufficient showing has been made here. Flynn's declaration identifies himself and his Skype account, explicitly consents to Respondent's disclosure of his communications (albeit limited to communication with only certain individuals/accounts), and is authored under penalty of perjury. *See* Dkt. No. 1-2 at 11–12. Flynn later twice completed Respondent's verification form, where he again identified himself and his Skype account, explicitly consented to Respondent's disclosure of his communications (first with limitations, then with none), and answered under penalty of perjury. *See* Dkt. No. 6 at 34–35; Dkt. No. 7-8 at 2–3. On the form, Flynn answered additional questions, including approximate date of account creation; email address provided at time of

---

[2] At least one court has postulated that the concept of "lawful consent" in 18 U.S.C. § 2702(b)(3) is probably akin to "that found in other criminal statutes, i.e., consent given by one who has the legal capacity to consent." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 561 (N.D. Tex. 2005). Some courts have also found that consent can be implied. *See, e.g.*, *Facebook, Inc. v. Superior Ct.*, 417 P.3d 725, 741–44 (Cal. 2018) (reviewing cases about implied consent where communications are configured to be public).

creation; country selected at time of registration; approximate date of last login; and up to three

contacts from his contacts list. *Id.* at 3. Petitioners also supply Skype screenshots and chats

provided by Flynn—further evidence that Flynn is the actual account holder. *See* Dkt. Nos. 1-5, 1-6.

This case is thus like cases where lawful consent was held to be established outside of a

service provider's own required process. *In re Akhmedova* featured a motion to quash subpoena

by Google, arguing (among other things) that ECPA prohibited disclosure of account contents.

No. MC20-80156, 2020 WL 6891828, at *2–4 (N.D. Cal. Nov. 24, 2020). The account holder,

Mr. Akhmedova, signed mandates at the direction of an English court,[3] in which he "expressly

states that he owns the accounts and consents to Google's production of their contents, including

specifically for purposes of compliance with the SCA." *Id.* at *3. Mr. Akhmedova also filed a

stipulation in the case stating that he did not object to disclosure. *Id.* Google argued that

Mr. Akhmedova's purported consent did not meet the "lawful consent" requirement because he

did not follow Google's "verified-consent" process. *Id.* The court summarized Google's

argument, which echoes in the briefing here:

> Google insists that its verified-consent process is the only
> acceptable means for an account holder to indicate consent. Given
> the nature and magnitude of its service, Google says that it cannot
> reasonably be expected to evaluate other means of expression of
> consent or to make judgments about whether a purported account
> holder is, in fact, the owner of a Google account, and that requiring
> it to make such judgments creates an unacceptable risk of exposure
> under the SCA.

*Id.* In rejecting the argument, the court praised Google's "concern for the privacy and security of

its accounts holders' communications," and acknowledged that its verification process "is

undoubtedly a satisfactory mechanism to obtain the account holder's consent." *Id.* But the court

---

[3] The English court had "accepted both Mr. Akhmedova's presentations and other evidence before it in concluding that he owns the accounts and ordering him to produce their contents." 2020 WL 6891828, at *3 n.1.

noted that "nothing in the SCA requires that consent be communicated in a manner Google prescribes or permits a service provider to dictate the form of acceptable consent." *Id.* This Court agrees with that conclusion. Further, the court observed that neither Mr. Akhmedova's status as account holder or consent to disclosure was "reasonably in dispute," and that "the only information in the record before the Court is that the accounts belong to Mr. Akhmedov[a]." *Id.* "Google points to no evidence suggesting that Mr. Akhmedova is not the owner of the accounts," it explained, "and he has clearly and expressly consented to production of their contents." *Id.* Likewise here, the only information in the record before this Court is that the accounts belong to Flynn, and he has provided consent to the disclosure of his communications in multiple formats.

*Super Vitaminas, S.A.*, cited by Petitioners, is also similar. No. MC17-80125, 2017 WL 5571037 (N.D. Cal. Nov. 20, 2017). There, Super Vitaminas sought emails received by its former employees on their company Google accounts. *Id.* at *1. In support of its application, Super Vitaminas submitted declarations from those employees, in which they consented to the disclosure of the emails. *Id.* at *4. The court thus concluded that lawful consent was established. *Id.* In its prior briefing, Respondent argues that *Super Vitaminas* is distinguishable because the employees "disclaimed any ownership or privacy interest in company emails." Dkt. No. 5 at 11; *see* Dkt. No. 6 at 69–78 (declarations). But the *Super Vitaminas* court did not make that distinction, or even acknowledge that there was any relevant issue regarding ownership of the emails or Google accounts. It simply held, without qualification, that the employees' declarations were sufficient to establish consent.

Respondent argues that "[t]he failure to provide verified consent is no small matter" and that "[its] consent verification process ensures that the actual accountholder provides consent," making it "critical not only to [Respondent's] compliance with federal law but also to the integrity of the larger data privacy ecosystem." Dkt. No. 9 at 4. The Court commends

Respondent's commitment to the privacy of its account holders and to compliance with ECPA. But as the *Akhmedova* court observed, and as Petitioners note here (Dkt. No. 12 at 4), nothing in ECPA requires consent to be communicated in Respondent's preferred manner. Nor does anything in ECPA require consent to be unlimited in its scope. Further, Flynn's status as account holder and his consent to disclosure are not reasonably in dispute. Respondent states that Flynn failed its verification process, but Respondent apparently refuses to disclose to *anyone*— Petitioners' counsel, the Court, or even Flynn himself—what part of the process he failed, or what he needs to correct. Respondent also does not provide any other evidence suggesting that the "David Flynn" who authored the declaration under penalty of perjury is not the owner of the "xcellent.choice" Skype account or did not give consent to disclosure. Under these circumstances, then, the Court concludes that ECPA's lawful-consent exception applies.

### IV.    CONCLUSION

Accordingly, Respondent Microsoft Corporation's Motion for Reconsideration (Dkt. No. 9) is DENIED. Respondent SHALL produce documents responsive to the subpoena, if any, **within fourteen (14) days** of this Order.

Dated this 15th day of January 2025.

Tana Lin
United States District Judge